## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| *In re*: Application Pursuant to 28 U.S.C. § 1782 of THE REPUBLIC OF THE GAMBIA, | ) ) ) ) | |
| Petitioner, | ) ) | |
| - to take discovery of - | ) ) ) | No. 20-mc-28 |
| | ) ) | |
| TWITTER, INC., | ) ) | |
| Respondent. | ) ) ) | |

## MEMORANDUM OF LAW IN SUPPORT OF THE REPUBLIC OF THE GAMBIA'S APPLICATION FOR ORDER TO TAKE DISCOVERY PURSUANT TO 28 U.S.C. § 1782

## TABLE OF CONTENTS

I.      INTRODUCTION ............................................................................................................. 1

II.     BACKGROUND ................................................................................................................ 2

        A.      Myanmar's Perpetration of Genocide Against the Rohingya ..................................2

        B.      The ICJ Proceedings .................................................................................................6

        C.      The Discovery Requested .........................................................................................8

III.    ARGUMENT ................................................................................................................... 10

        A.      The Gambia's Application Satisfies All of the Statutory Requirements of 28
                U.S.C. § 1782 ........................................................................................................11

                1.      Twitter Is Found in the District of Columbia.............................................12

                2.      The ICJ Proceedings are Before an International Tribunal ........................12

                3.      As a Litigant in the ICJ Proceedings, The Gambia is an "Interested
                        Party" .........................................................................................................13

        B.      The *Intel* Discretionary Factors Weigh in Favor of Granting The Gambia's
                Application..............................................................................................................14

                1.      Twitter is Not a Participant in the ICJ Proceedings...................................14

                2.      The ICJ is Not Resistant to § 1782 Discovery...........................................15

                3.      The Gambia Is Not Concealing an Attempt to Circumvent Any ICJ
                        Proof-Gathering Restrictions .....................................................................16

                4.      The Discovery The Gambia Seeks Is Relevant and Narrowly Tailored....17

IV.     CONCLUSION................................................................................................................. 17

# TABLE OF AUTHORITIES

**Cases**

*In re Barnwell Enters.*, 265 F. Supp. 3d 1 (D.D.C. 2017) ................................................. 12, 15, 17

*In re Digiulian*, 314 F. Supp. 3d 1 (D.D.C. 2018) .................................................................... 15, 17

*In re the Republic of Ecuador*, C-10-80225 MISC CRB (EMC),
    2010 U.S. Dist. LEXIS 132045 (N.D. Cal. Dec. 1, 2010) ........................................................ 13

*In re Veiga*, 746 F. Supp. 2d 8 (D.D.C. 2010) ............................................................. 11, 15, 16, 17

*Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241 (2004) ...................................... passim

**Statutes**

28 U.S.C. § 1782 ....................................................................................................................... passim

**Rules**

Fed. R. Civ. P. 30(b)(6) ............................................................................................................. 10, 17

**International Materials**

*Application of the Convention on the Prevention and Punishment of the Crime of Genocide
    (Gam. v. Myan.)*, Order, (Jan. 23, 2020), https://www.icj-cij.org/files/case-related/178/178-
    20200123-ORD-01-00-EN.pdf ................................................................................................... 7

Convention on the Prevention and Punishment of the Crime of Genocide,
    Dec. 9, 1948, 78 U.N.T.S. 277 ................................................................................................... 6

Rules of Court (1978), International Court of Justice ............................................................. 15, 16

Statute of the International Court of Justice, June 26, 1945, 59 Stat. 1055, T.S. No. 993 ..... 13, 14

## I.    INTRODUCTION

The Republic of The Gambia ("The Gambia"), a sovereign State located on the coast of

West Africa, respectfully submits this memorandum of law in support of its application pursuant

to 28 U.S.C. § 1782 for an order directing Twitter, Inc. ("Twitter") to produce a limited number

of documents and submit to a deposition to aid The Gambia in connection with ongoing judicial

proceedings that it instituted in November 2019 against the Republic of the Union of Myanmar

("Myanmar"), a sovereign State located in Southeast Asia, before the International Court of

Justice ("ICJ"), in The Hague, Netherlands.[1] Those proceedings are styled *The Gambia v.*

*Myanmar (Application of the Convention on the Prevention and Punishment of the Crime of*

*Genocide).* In the case now pending before the ICJ, The Gambia seeks to hold Myanmar

accountable under international law for commission of the crime of genocide against the

Rohingya people, an ethnic and religious minority in Myanmar, and to obtain an order from the

ICJ that Myanmar, *inter alia*, cease and desist from further acts of genocide against the

Rohingya.

The Gambia respectfully appears before this honorable District Court to seek limited

discovery from Twitter, pursuant to § 1782, in aid of the proceedings before the ICJ. That section

provides that "[t]he district court of the district in which a person resides or is found may order

him to give his testimony or statement or to produce a document or other thing for use in a

proceeding in a foreign or international tribunal … ." 28 U.S.C. § 1782(a).

As explained below, the application should be granted because it satisfies the statutory

requirements for obtaining discovery under § 1782. In particular, (i) The Gambia seeks discovery

---

[1] The Republic of The Gambia does not waive any rights or privileges to which it is entitled under the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602 *et seq*., or any other rights or privileges. All such rights or privileges are expressly reserved.

from an entity (Twitter) that is found in this District; (ii) the discovery will be used in proceedings that are pending before an international tribunal, namely the ICJ; and (iii) The Gambia – as the Applicant (*i.e.*, Plaintiff) in the ICJ case – is an interested party in the litigation. Further, the discretionary factors identified by the Supreme Court in *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241 (2004), all militate in favor of granting the requested discovery: (i) Twitter is not a party to the case before the ICJ; (ii) the ICJ is receptive to discovery obtained pursuant to § 1782; (iii) The Gambia's application is not an attempt to circumvent the ICJ's proof-gathering requirements; and (iv) the discovery that The Gambia seeks is highly relevant to the matters in dispute in the underlying litigation and is narrowly tailored to avoid imposing any undue burden or intrusion on the respondent.

For these reasons, which are set forth more fully below, The Gambia respectfully submits that its application for discovery pursuant to § 1782 should be granted.

## II.    BACKGROUND

### A.    Myanmar's Perpetration of Genocide Against the Rohingya

Nearly all Rohingya have historically resided in Myanmar's Rakhine State, a political subdivision of Myanmar, which is located in the westernmost extremity of the country, along the border with Bangladesh. The Rohingya are an ethnic and religious minority within Rakhine State as well, where the majority of the population are ethnic Rakhine (also known as Arakanese), a group that is predominantly Buddhist. The Rohingya are predominantly Muslim.

The Government of Myanmar has subjected the Rohingya to extreme forms of persecution. In 2017, the United Nations Human Rights Council established an Independent International Fact-Finding Mission on Myanmar ("UN Fact-Finding Mission" or "the Mission") to investigate and report on serious allegations of human rights violations in Rakhine State. The UN Fact-Finding Mission concluded: "[t]he Rohingya are in a situation of severe, systemic and

- 2 -

institutionalised oppression from birth to death. Their extreme vulnerability is a consequence of State policies and practices implemented over decades."[2] Indeed, the Mission found that the "level of oppression faced by the Rohingya is hard to fathom" and that "[c]umulatively" the "rules, regulations, orders and practices" which Myanmar has imposed have "made life for the Rohingya in Rakhine State slowly but steadily unbearable."[3] Myanmar adopted these measures, the Mission concluded, "to implement a racist and exclusionary vision."[4]

Myanmar's persecution of the Rohingya escalated dramatically in October 2016, when its military and security forces commenced what Myanmar itself refers to as "clearance operations" against Rohingya villages. During these operations, Myanmar forces systematically shot, killed, carried out mass executions, forcibly disappeared, raped, gang raped, sexually assaulted, detained, beat and tortured Rohingya civilians, and burned down and destroyed Rohingya homes, mosques, madrassas, shops and Qur'ans.[5]

The initial wave of clearance operations lasted approximately four months; they resumed with even greater brutality in August 2017. Myanmar soldiers, accompanied by other security forces, entered Rohingya villages early in the morning whilst most villagers were asleep, and fired rocket launchers, mortars, and bullets into Rohingya homes.[6] The Government forces then

---

[2] U.N. Human Rights Council, *Report of the detailed findings of the Independent International Fact-Finding Mission on Myanmar*, UN Doc. A/HRC/39/CRP.2, ¶ 458 (Sept. 17, 2018), https://www.ohchr.org/Documents/HRBodies/HRCouncil/FFM-Myanmar/A_HRC_39_CRP.2.pdf (hereinafter "2018 Detailed FFM Report").

[3] *Id*. at ¶ 622.

[4] *Id*. at ¶ 497.

[5] *Id.* at ¶¶ 1069-95.

[6] *Id.* at ¶¶ 752, 961.

tortured, raped and killed the inhabitants, including those who tried to flee, before burning their homes to the ground, often with members of the Rohingya group inside.[7] "Rape and other sexual and gender-based violence," including gang rapes, sexually humiliating acts, sexual slavery and sexual mutilations, were "perpetrated on a massive scale."[8] Satellite imagery reveals that wherever the Tatmadaw carried out a clearance operation in an area of mixed ethnicity, only Rohingya settlements were targeted.[9]

The U.N. Fact-finding Mission concluded that the "actions of those who orchestrated the attacks on the Rohingya read as a veritable check-list" of indicators of their intent to commit genocide, that is, the intent to destroy the Rohingya in whole or in part. These include "the systematic stripping of human rights, the dehumanizing narratives and rhetoric, the methodical planning, mass killing, mass displacement, mass fear, overwhelming levels of brutality, combined with the physical destruction of the home of the targeted population, in every sense and on every level." The Mission therefore determined there are reasonable grounds to conclude that Myanmar had committed genocide.[10]

Other highly respected organizations likewise concluded that Myanmar is responsible for committing genocide against the Rohingya. In December 2018, the United States Holocaust Memorial Museum concluded there is "compelling evidence that Burmese authorities have intentionally sought to destroy the Rohingya people because of their ethnic and religious

---

[7] *Id*. at ¶¶ 884-991.

[8] *Id*. at ¶ 920.

[9] *Id*. at ¶¶ 972-73.

[10] *Id*. at ¶¶ 1440-41.

identity… . The world has turned a blind eye to their persecution – just as it did for victims of the

Holocaust."[11]

Similarly, the Public International Law and Policy Group ("PILPG"), a global *pro bono*

law firm focused on issues of war crimes and transitional justice, undertook a comprehensive

investigation of the Rohingya situation on behalf of the U.S. State Department.[12] Based on its

analysis of more than 1,000 witness interviews, PILPG stated:

> With regard to the crime of genocide, this Report concludes that
> there are reasonable grounds to believe that genocide was
> committed against the Rohingya in Myanmar's northern Rakhine
> State. The Rohingya are a protected group for purposes of the law
> on genocide, and the investigation mission revealed extensive
> evidence of underlying acts of genocide committed against a
> substantial population of Rohingya, including killings, causing
> serious bodily or mental harm, and deliberately inflicting
> conditions of life calculated to bring about the Rohingya's physical
> destruction in whole or in part. The investigation mission also
> revealed circumstantial evidence providing reasonable grounds to
> believe these acts were committed with the intent to destroy, at
> least in part, the Rohingya in northern Rakhine State.[13]

---

[11] U.S. Holocaust Memorial Museum, *Museum Finds Compelling Evidence Genocide was Committed Against Rohingya, Warns of Continued Threat* (Dec. 3, 2018), https://www.ushmm.org/information/press/press-releases/museum-finds-compelling-evidence-genocide-was-committed-against-rohingya-wa.

[12] PUBLIC INTERNATIONAL LAW AND POLICY GROUP, DOCUMENTING ATROCITY CRIMES COMMITTED AGAINST THE ROHINGYA IN MYANMAR'S RAKHINE STATE: FACTUAL FINDINGS, i (Sept. 2018), https://www.publicinternationallawandpolicygroup.org/s/PILPG-Documenting-Atrocity-Crimes-Against-Rohingya-Factual-Findings-Report-September-2018-h7tk.pdf.

[13] PUBLIC INTERNATIONAL LAW AND POLICY GROUP, DOCUMENTING ATROCITY CRIMES COMMITTED AGAINST THE ROHINGYA IN MYANMAR'S RAKHINE STATE: FACTUAL FINDINGS & LEGAL ANALYSIS, vii (Dec. 2018), https://www.publicinternationallawandpolicygroup.org/s/PILPG-ROHINGYA-REPORT-Factual-Findings-and-Legal-Analysis-3-Dec-2018-1.pdf.

On April 22, 2020, the International Association of Genocide Scholars formally adopted a resolution declaring Myanmar's persecution of the Rohingya a crime of genocide.[14]

### B.    The ICJ Proceedings

On November 11, 2019, The Gambia commenced judicial proceedings against Myanmar in the International Court of Justice in The Hague (the "ICJ Proceedings") under the 1948 Convention on the Prevention and Punishment of the Crime of Genocide, Dec. 9. 1948, 78 U.N.T.S. 277 (the "Genocide Convention"). The Gambia and Myanmar are both parties to the Genocide Convention, which provides for jurisdiction before the ICJ for "[d]isputes between the Contracting Parties relating to the interpretation, application or fulfilment of the present Convention, including those relating to the responsibility of a State for genocide."[15] The Gambia and Myanmar are the only parties to the case.

The Gambia contends that Myanmar is responsible for acts of genocide committed against the Rohingya, as well as attempting to commit genocide, conspiring to commit genocide, inciting genocide, complicity in genocide, and failing to prevent and punish genocide. A finding that acts of genocide occurred against the Rohingya requires The Gambia to prove that Myanmar committed any of the acts enumerated in Article II of the Genocide Convention – which include killing, causing serious bodily and mental harm, inflicting conditions that are calculated to bring about physical destruction, and imposing measures to prevent births – with the intent to destroy the Rohingya, in whole or in part.

---

[14] INTERNATIONAL ASSOCIATION OF GENOCIDE SCHOLARS, *Resolution to Declare the Rohingya Persecution a Crime of Genocide and Crimes Against Humanity*, April 22, 2020, https://genocidescholars.org/persecution-of-rohingya-declared-genocide-crime-against-humanity/.

[15] Convention on the Prevention and Punishment of the Crime of Genocide, Art. IX, Dec. 9, 1948, 78 U.N.T.S. 277.

On December 10-12, 2019, oral proceedings were held before the ICJ on a request by
The Gambia that the Court order provisional measures (akin to a preliminary injunction) to
protect its rights and the rights of the Rohingya during the pendency of the ICJ Proceedings. On
January 23, 2020, in a unanimous 17-0 ruling, the Court ordered Myanmar to take all measures
within its power to prevent the commission of all acts of genocide against the Rohingya,
including killings, causing serious bodily or mental harm, inflicting conditions of life calculated
to bringing about their physical destruction, and imposing measures to restrict births.[16] The Court
also ordered Myanmar and all units under its direction, control, or influence to not commit
genocide, conspiracy to commit genocide, incitement to genocide, attempt to commit genocide,
or complicity in genocide.[17] Myanmar was ordered as well to preserve all evidence relating to
allegations of the crime of genocide, and to report back to the Court in four months and then
every six months thereafter on its compliance with the Order.[18] In issuing its January 23, 2020
Order, the ICJ underscored that the Rohingya "remain extremely vulnerable" to genocide, and
that "there is a real and imminent risk of irreparable prejudice to the rights invoked by The
Gambia."[19]

Proceedings before the ICJ generally consist of two phases: a written phase, during which
the parties exchange written briefs and supporting documentary evidence; and a subsequent oral
hearing, during which the parties may present witness testimony and oral argument. The Parties

---

[16] *Application of the Convention on the Prevention and Punishment of the Crime of Genocide
(Gam. v. Myan.)*, Order, ¶ 86 (Jan. 23, 2020), https://www.icj-cij.org/files/case-related/178/178-20200123-ORD-01-00-EN.pdf.

[17] *Id*.

[18] *Id*.

[19] *Id*. at ¶¶ 72, 75.

are currently in the midst of the written phase, which will extend at least until January 23, 2021. After the written phase concludes, the ICJ will schedule the oral hearing.

### C. The Discovery Requested

Statements on social media, including Twitter, made by officials and representatives of Myanmar hostile to the Rohingya, or encouraging violence against them, including but not limited to statements made by senior military officers directed at rank-and-file soldiers or armed civilians who carried out attacks against the Rohingya, may constitute evidence of genocidal intent necessary to support a finding of responsibility for genocide.

Social media platforms are the dominant means in Myanmar of disseminating anti-Rohingya hate speech and incitement to violence. The UN Fact-Finding Mission concluded that such hate speech against the Rohingya is pervasive in Myanmar, and that "[m]essages portraying Rohingya as violent, dishonest, anti-Bamar, anti-Buddhist, illegal immigrants and/or terrorists … are particularly widespread on social media."[20]

Reporting by media organizations indicates that this type of hate speech was disseminated via Twitter.[21] It has been further reported that Myanmar state entities and governmental officials have engaged in platform manipulation and coordinated inauthentic behavior on Twitter to advance anti-Rohingya policies and propaganda.[22]

The United States has placed sanctions on Myanmar state officials – including Senior General Min Aung Hlaing, the current Commander-in-Chief of the Myanmar Armed Forces – for

---

[20] 2018 Detailed FFM Report at ¶ 1342.

[21] *See*, *e.g.*, Steve Stecklow*, Facebook isn't alone*, REUTERS, Aug. 15, 2018, https://www.reuters.com/investigates/special-report/myanmar-facebook-hate/.

[22] *Id*.

their responsibility for the crimes that Myanmar committed against the Rohingya.[23] When

announcing the sanctions, the U.S. Treasury Department observed that "[e]lements of the

Burmese military have committed serious human rights abuse against members of ethnic

minority groups across Burma, including those in the northern Rakhine" state.[24] Regarding

General Hlaing in particular, the Treasury Department stated:

> Min Aung Hlaing is designated for his role as the Commander-in-Chief of the Burmese military forces, an entity that has engaged in or whose members have engaged in serious human rights abuse under his command. Min Aung Hlaing's military forces were responsible for the brutal security operation that began in August 2017 in Rakhine State and ultimately caused more than 500,000 people to flee to Bangladesh. During this time, members of ethnic minority groups were killed or injured by gunshot, often while fleeing, or by soldiers using large-bladed weapons; others were burned to death in their own houses. There are credible claims of mass-scale rape and other forms of sexual violence committed by soldiers under Min Aung Hlaing's command.[25]

General Hlaing had a Twitter account (@sgminaunghlaing) that is reported to have been

suspended or terminated by Twitter in May 2019 because the account had been used to

disseminate anti-Rohingya hate speech that fomented violence against them.[26] The account's

suspension or termination makes its contents no longer available on the Twitter communications

platform.

---

[23] U.S. DEP'T OF THE TREASURY, *Treasury Sanctions Individuals for Roles in Atrocities and Other Abuses* (Dec. 20, 2019), https://home.treasury.gov/news/press-releases/sm852.

[24] *Id*.

[25] *Id*.

[26] *See* Paul Eckert, *Twitter Suspends Account of Top Myanmar General Over Hate Speech*, RADIO FREE ASIA, May 16, 2019, https://www.rfa.org/english/news/myanmar/twitter-military-05162019162336.html.

The Gambia is interested in all evidence indicating the involvement of Myanmar State officials and entities, or those affiliated with State officials and entities, in spreading anti-Rohingya hate speech on Twitter, including the content of those tweets. Specifically, The Gambia's request for discovery is limited to the following narrow and discrete categories of electronic content and documents:

(i)     All documents produced, drafted, or published by the Twitter account of Myanmar General Min Aung Hlaing, @sgminaunghlaing;

(ii)    All documents produced, drafted, or published by any other account belonging to or controlled by a Myanmar state official, representative, or entity whose account was suspended or terminated by Twitter for concerns relating to human rights or the dissemination of hate speech;

(iii)   All documents relating to any internal investigations conducted by Twitter of coordinated inauthentic behavior, or other terms of service violations, from 2012 to the present, committed by accounts belonging to or controlled by Myanmar state officials, representatives, entities or groups acting in coordination, or suspected of acting in coordination, with Myanmar state entities; and

(iv)    A deposition pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure regarding the subject-matters described above.

## III.   ARGUMENT

This Court has the authority to grant The Gambia's § 1782 request for assistance in obtaining evidence for use in connection with the ICJ Proceedings. As shown below, The Gambia's application meets the statutory requirements for obtaining discovery under § 1782. As the Court has previously explained, "[a] district court has the authority to grant an application

when three conditions are met: (1) the person from whom discovery is sought resides or is found within the district; (2) the discovery is for use in a proceeding before a foreign or international tribunal; and (3) the application is made by an interested person." *In re Veiga*, 746 F. Supp. 2d 8, 17 (D.D.C. 2010). The Gambia satisfies all three requirements: Twitter is found in the District of Columbia; The Gambia seeks the discovery for use in connection with a proceeding pending before an international tribunal (the ICJ); and, since it is a litigant in the ICJ Proceedings, The Gambia is an "interested person" for purposes of § 1782.

In addition, the four discretionary factors that have been identified by the United States Supreme Court in *Intel Corp.*, 542 U.S. at 249, all weigh in favor of granting The Gambia's request. Twitter is not a party to the ICJ proceedings; the ICJ is not opposed to this form of discovery; The Gambia is not concealing an attempt to circumvent the requirements of the ICJ; and the discovery sought is both highly relevant to the matters in dispute and narrowly tailored to avoid imposing any undue burden or intrusion on the respondents.

### A.   The Gambia's Application Satisfies All of the Statutory Requirements of 28 U.S.C. § 1782

Section 1782 of Title 28 authorizes federal district courts to assist foreign litigants and other interested parties in gathering evidence for use in a proceeding before a foreign or international tribunal. *See* 28 U.S.C. § 1782; *Intel*, 542 U.S. at 247. The statute provides that:

> The district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal, including criminal investigations conducted before formal accusation. The order may be made pursuant to a letter rogatory issued, or request made, by a foreign or international tribunal or upon the application of any interested person and may direct that the testimony or statement be given, or the document or other thing be produced, before a person appointed by the court …. To the extent that the order does not prescribe otherwise, the testimony or statement shall be taken, and

> the document or other thing produced, in accordance with the
> Federal Rules of Civil Procedure. 28 U.S.C § 1782(a).

Thus, in deciding if it has authority to grant the § 1782 application, the District Court

must determine:

> whether the person from whom discovery is sought resides in its
> district, whether the discovery sought is for use in a proceeding
> before a foreign or international tribunal, and whether the
> application is made by a foreign or international tribunal or any
> interested person.

*In re Barnwell Enters.*, 265 F. Supp. 3d 1, 8-9 (D.D.C. 2017). The Gambia's application satisfies

all three requirements.

### 1.     Twitter Is Found in the District of Columbia

The first statutory requirement for obtaining discovery pursuant to § 1782 is that the

entity from which discovery is sought must be found or reside in the District in which the

application is made. Here, Twitter is found in this District, as it maintains an office at 800

Connecticut Ave NW, Suite 500, Washington, DC 20006.[27] The Twitter DC office also tweets at

@TwitterDC.[28]

### 2.     The ICJ Proceedings Are Before an International Tribunal

The second statutory requirement is that the discovery must be sought for use in

connection with a proceeding before a foreign or international tribunal. In this case, the

discovery that is sought will be used for the proceedings before the International Court of Justice.

The ICJ is unquestionably an international tribunal. *See Intel*, 542 U.S. at 258. It is the principal

judicial organ of the United Nations. It was established in June 1945 by the Charter of the United

---

[27] *See* Twitter DC (@TwitterDC), TWITTER, https://www.facebook.com/pages/Twitter-DC/1946976485527412 (noting office address).

[28] *See* Twitter DC (@TwitterDC), TWITTER, https://twitter.com/twitterdc?lang=en.

Nations and commenced work in April 1946. The Statute of the International Court of Justice is annexed to the Charter of the United Nations, of which it forms an integral part. The ICJ's role is to settle, in accordance with international law, legal disputes submitted to it by States and to give advisory opinions on legal questions referred to it by authorized United Nations organs and specialized agencies. The seat of the ICJ is at the Peace Palace in The Hague, The Netherlands. The ICJ has jurisdiction over disputes between States concerning the interpretation or application of the Genocide Convention. In light of these characteristics, it is beyond dispute that the ICJ is an international tribunal. *See* RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW § 103, cmt. b (1987) (referring to the International Court of Justice as an example of an "international tribunal").

### 3.    As a Litigant in the ICJ Proceedings, The Gambia is an "Interested Party"

The final statutory requirement is that the applicant must be an "interested party" in the underlying foreign or international proceeding. Here, The Gambia is such an "interested party." Litigants in a case being adjudicated before a foreign or international tribunal are "interested parties" for purposes of § 1782. The Supreme Court has held that "[n]o doubt litigants are included among, and may be the most common example of, the 'interested person[s]' who may invoke § 1782." *Intel*, 542 U.S.  at 256. Moreover, as a *foreign state* litigant, The Gambia represents just the sort of "interested party" that § 1782 was intended to assist since its origins in 1863. *See In re the Republic of Ecuador*, No. C-10-80225 MISC CRB (EMC), 2010 U.S. Dist. LEXIS 132045, at *7-9 (N.D. Cal. Dec. 1, 2010) (tracing how the predecessor statutes to § 1782 only covered cases in foreign courts in which a foreign state was a party or had an interest; subsequent amendments broadened, rather than narrowed, the definition of "interested person" under § 1782). Accordingly, The Gambia is an "interested party" within the meaning of § 1782.

In sum, The Gambia's application satisfies all three statutory requirements: the Respondent is found in this District; the discovery The Gambia seeks will be used in litigation before an international tribunal; and The Gambia is an interested party in that proceeding. As demonstrated in the following section, the discretionary factors that have been identified by the Supreme Court also weigh in favor of granting The Gambia's application.

**B.     The *Intel* Discretionary Factors Weigh in Favor of Granting The Gambia's Application**

A court's discretion to grant a § 1782 discovery application is guided by the discretionary factors identified by the Supreme Court in *Intel*. Each of the factors identified by the Supreme Court militate in favor of granting the application.

### 1.     Twitter is Not a Participant in the ICJ Proceedings

First, *Intel* held that in deciding whether to allow discovery under § 1782, a district court should consider whether "the person from whom discovery is sought is a participant in the foreign proceeding." This is because "the need for § 1782(a) aid [against a participant] generally is not as apparent as it ordinarily is when evidence is sought from a nonparticipant in the matter arising abroad." *Intel,* 542 U.S. at 264.

Twitter is not a participant in the ICJ Proceedings. Nor could it be since "[o]nly States may be parties in cases before the Court." Statute of the International Court of Justice, art. 34, para. 1, June 26, 1945, 59 Stat. 1055, T.S. No. 993. Thus, the evidence held by Twitter is outside the jurisdictional reach of the ICJ. Indeed, § 1782 was enacted specifically to assist parties in litigation facing this type of situation. "A foreign tribunal has jurisdiction over those appearing before it…. In contrast, nonparticipants in the foreign proceeding may be outside the foreign tribunal's jurisdictional reach; hence, their evidence, available in the United States, may be unobtainable absent [section] 1782(a) aid." *Intel*, 542 U.S. at 264. Therefore, the fact that the

entity from which discovery is sought is a "nonparticipant" in the foreign or international proceedings "typically weigh[s] in favor of granting the requested discovery." *Intel*, 542 U.S. at 264; *see also In re Barnwell Enters.*, 265 F. Supp. 3d at 10 (finding that Respondent "is not a participant in the foreign proceedings … militates in favor of granting Petitioners' application").

### 2. The ICJ is Not Resistant to § 1782 Discovery

Second, *Intel* held that a district court should consider the "receptivity" of the foreign or international tribunal in question to "U.S. federal-court judicial assistance." *Intel,* 542 U.S. at 264. This does not require the district court to engage in an extensive analysis of whether a foreign or international tribunal would be receptive to discovery assistance. Rather, the inquiry is confined to determining whether there is authoritative proof that the tribunal would reject evidence obtained with the aid of § 1782. *In re Digiulian*, 314 F. Supp. 3d 1, 8 (D.D.C. 2018); *In re Barnwell Enters.*, 265 F. Supp. 3d at 10-11. The Respondent bears the burden of proof of demonstrating that the tribunal would refuse the evidence in question. *In re Barnwell Enters.*, 265 F. Supp. 3d at 10-11; *In re Veiga*, 746 F. Supp. 2d at 23-24 ("The party resisting discovery must point to 'authoritative proof' that the foreign tribunal would reject the evidence sought.").

In this case, The Gambia seeks discovery of evidence that would be presented in The Gambia's written pleadings to the ICJ. Not only is there no basis on which to conclude that the ICJ would be resistant to such evidence, the governing Rules of the International Court of Justice expressly permit litigants to present such evidence. *See* Rules of Court (1978), International Court of Justice, art. 50(1) ("There shall be annexed to the original of every pleading certified copies of any relevant documents adduced in support of the contentions contained in the pleading."). Consequently, the second *Intel* factor weights in favor of granting The Gambia's application.

### 3. The Gambia Is Not Concealing an Attempt to Circumvent Any ICJ Proof-Gathering Restrictions

Third, *Intel* held that a district court should consider "whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States." *Intel,* 542 U.S. at 264-65. This factor is intended to protect against an applicant's misuse of the process by verifying that it is not attempting to avoid proof-gathering restrictions that are imposed in the underlying proceeding. However, the law is clear that, absent bad faith on the part of the applicant, a court will not weigh this factor against allowing discovery. *In re Veiga*, 746 F. Supp. 2d at 25 ("no evidence in the record … that would lead this Court to believe that Applicants have sought to circumvent the proof-gathering procedures or policies of the foreign tribunals or otherwise brought their applications in bad faith").

In this case, there are no proof-gathering restrictions that have been imposed in the ICJ Proceedings. Furthermore, The Gambia's application is a good faith attempt to seek discovery that would assist it in presenting its case at the ICJ, namely by obtaining additional evidence of the genocidal intent of Myanmar's officials and representatives, and the abuse of media platforms by Myanmar state actors to further their acts of genocide against the Rohingya. The Gambia seeks to use § 1782 to aid it in giving effect to its right to present evidence to the ICJ, a right that is codified in Article 50(1) of the Rules of the International Court of Justice. Since the ICJ's jurisdiction extends only to sovereign States, it has no jurisdiction over Twitter, or any other private entity, which makes it necessary for The Gambia to pursue discovery from Twitter through the District Court.

### 4.     The Discovery The Gambia Seeks Is Relevant and Narrowly Tailored

Lastly, *Intel* held that a district court should consider whether "unduly intrusive or burdensome requests may be rejected or trimmed." *Intel*, 542 U.S. at 265. In reviewing this factor, courts look to whether the request is sufficiently tailored to the litigation issues for which production is sought. *In re Digiulian*, 314 F. Supp. 3d at 9; *see also In re Veiga*, 746 F. Supp. 2d at 25.

Here, it is beyond question that The Gambia's request is narrowly tailored and not unduly burdensome or intrusive. The Gambia has confined its request solely to (1) information in the account of a specific Myanmar state official (General Min Aung Hlain); (2) any other state official or representative whose account may have been similarly suspended; (3) any documents pertaining to investigations conducted by Twitter regarding Myanmar's use of its platform to further its persecution of the Rohingya; and (4) a deposition pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure regarding the aforementioned subject matters. This limited discovery cannot be considered overly broad or unduly burdensome. *In re Barnwell Enters.*, 265 F. Supp. 3d at 14.

In sum, The Gambia's §1782 application satisfies both the relevant statutory requirements and the discretionary factors that have been identified by the Supreme Court in *Intel*. The Gambia's application accordingly should be granted.

## IV.     CONCLUSION

For the foregoing reasons, The Gambia respectfully requests that this Court grant its § 1782 discovery application and enter the accompanying proposed order directing Twitter to produce the documents requested.

Dated: May 4, 2020                       Respectfully submitted,

THE REPUBLIC OF THE GAMBIA
By its attorneys,
/s/ Paul S. Reichler
Paul S. Reichler (D.C. Bar No. 185116)
PReichler@foleyhoag.com
M. Arsalan Suleman (D.C. Bar No. 1602486)
ASuleman@foleyhoag.com
FOLEY HOAG LLP
1717 K Street, NW
Washington, DC 20006-5350
Tel: 202-223-1200
Fax: 202-785-6687

Andrew B. Loewenstein (D.C. Bar No. MA0018)
aloewenstein@foleyhoag.com
FOLEY HOAG LLP
Seaport West
155 Seaport Boulevard
Boston, MA 02210-2600
Tel: 617-832-1000
Fax: 617-832-7000

*Counsel for Applicant, Republic of The Gambia*